UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SHALOM POLLACK O/B/O R.T.P.,

                           Plaintiff,

                                                    **MEMORANDUM & ORDER**
             -against-.                             14−CV−07120

COMMISSIONER OF SOCIAL SECURITY,

                           Defendant.
-------------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

       Plaintiff Shalom Pollack[1] ("Plaintiff") brings this action on behalf of his daughter, R.T.P.,

under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the Social Security

Administration's ("SSA") denial of her application for Supplemental Security Income ("SSI") on

April 19, 2013. The parties have cross-moved for judgment on the pleadings. Plaintiff seeks

reversal of the Commissioner of Social Security's ("Commissioner" or "Defendant") decision and

requests a remand solely for the purpose of approval and calculation of SSI benefits, or

alternatively, for further administrative proceedings. Defendant seeks to have the Court affirm the

Commissioner's disability determination. For the reasons set forth below, Plaintiff's motion for

judgment on the pleadings is GRANTED IN PART and DENIED IN PART, and Defendant's

motion is DENIED. The Court reverses the Commissioner's decision and remands R.T.P.'s claim

to the Commissioner for further proceedings consistent with this Order.

---

[1] Plaintiff's name is spelled inconsistently in both the Administrative Record and in the
parties' briefing. Variations on Plaintiff's first name include "Shalom," "Sholom," and
"Soloman," and variations on his last name include "Pollack" and "Pollak." The Court has
amended the caption to conform to Plaintiff's briefing.

*BACKGROUND*

I.    Claimant's Personal History

Claimant R.T.P. is a female child, born July 28, 2003, who lives with her parents and her three siblings.  (Tr.[2] 126–30, 143.)  The family speaks Yiddish, English, and Hebrew in the home, though Yiddish is the primary language.  (Tr. 143.)  Plaintiff, R.T.P.'s father, applied for SSI on R.T.P.'s behalf with a protective filing date of December 30, 2011, alleging that as of January 1, 2011, R.T.P. had a learning disorder and dyslexia that caused pain or other symptoms, rendering her disabled.  (Tr. 126, 127, 130.)

A Disability Report, "submitted in connection to the initial SSI application" (Def. Mot.[3] at 9) and dated January 26, 2012 (Tr. 127), indicates that, as of that date, R.T.P. was in third-grade special education classes at OHR Halimud, a school in Brooklyn, New York, and received speech/language therapy, despite not having been tested for behavioral or learning problems (Tr. 132).  In a subsequent, though undated, Disability Report, Plaintiff indicated there had been no changes in R.T.P.'s condition since the January 26, 2012 Report, and that R.T.P. had not seen a doctor, had not had any medical tests done, or taken any medication, for her condition.  (Tr. 137–40.)  The Disability Report described R.T.P.'s ability to care for her personal needs as "NEED[ING] ASSISTANCE WITH ALL [HER] DAILY ACTIVITIES."  (Tr. 137–40.)  In a

---

[2] All references to "Tr." refer to the consecutively paginated Administrative Transcript. (*See* Dkt. 7.)

[3] All references to "Def. Mot." refer to Defendant's Memorandum of Law in Support of the Acting Commissioner's Motion for Judgment on the Pleadings. (*See* Dkt. 13.)  All references to "Pl. Opp." refer to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Judgment on the Pleadings and in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings. (*See* Dkt. 11-1.)  All references to "Def. Reply" refer to Defendant's Memorandum of Law in Further Support of the Defendant's Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Cross-Motion for Judgment on the Pleadings. (*See* Dkt. 14.)

questionnaire regarding R.T.P.'s childhood activities, signed in February 2012, Plaintiff reported that he had noticed problems in how R.T.P. acted around other people; her speech; her self-care activities such as going to the bathroom and washing herself; her play, both by herself and with others; and her behavior generally, including in school, though Plaintiff gave no specific information as to any of these categories. (Tr. 135–36.)

## II.    Claimant's Medical and Psychoeducational History

### A.    University Eye Center (SUNY Optometry) Records.

On May 9, 2011, R.T.P. was examined by Dr. Hadassa Rutman, O.D., at the University Eye Center, having been referred to determine whether R.T.P.'s academic and concentration difficulties, as well as poor reading and writing skills, were visual or attentional in nature. (Tr. 174.) Dr. Rutman noted "[s]evere attentional deficits [] during testing period,"[4] along with a number of ocular deficiencies, for which she recommended visual therapy sessions, as well as a psychoeducational evaluation to rule out attention- and academic-related issues. (Tr. 176.)

On June 13, 2011, R.T.P. underwent a second evaluation, this time by Dr. Rochelle Mozlin, O.D. (Tr. 169.) Dr. Mozlin noted R.T.P. responded well during the exam and did not require a prescription, though Dr. Mozlin recommended that R.T.P. continue with visual therapy sessions. (Tr. 169–70.)

R.T.P. completed at least twelve visual therapy sessions from July 19, 2011 through October 25, 2011. (Tr. 152–168.) Her sessions were focused on remediation of her oculomotor skills. (Tr. 152.) During many such sessions, however, doctors noted attentional behavior consistent with the initial notation of severe attentional deficits. (*See, e.g.*, Tr. 154 (describing

---

[4] Dr. Rutman's notes from R.T.P.'s May 9, 2011 visit indicate that R.T.P. had a prior perceptual evaluation conducted on October 13, 2010, in which attention deficits were noted to contribute to the possible findings of overall perceptual deficits. (Tr. 174.)

R.T.P. as "very impulsive" and "easily distractable [sic]"); Tr. 155 ("easily distractable [sic]" and "losing attention"); Tr. 156 ("Loses concentration very easily"); Tr. 157 ("Attention difficult to maintain" and "lost attention very easily"); Tr. 159 ("Attention was difficult to maintain"); Tr. 160 ("constantly lost attention"); Tr. 161 ("Attention very good today" but "[R.T.P.] loses attention very quickly and resists doing activities she considers too hard").) Her eighth such therapy session resulted in the following file notation: "[R.T.P.] loses attention very quickly and resists doing activities she considers too hard. Attempts to incentivize doing activities were used to no avail." (Tr. 160.) This sentiment was reiterated in multiple subsequent sessions (*see, e.g.*, Tr. 162 (ninth session); Tr. 163 (tenth session); Tr. 165 (eleventh session)), and in her final session, R.T.P. was described as "uncooperative for most of the session," such that her mother "was asked to help in controlling [R.T.P.]," though she remained "uncooperative." (Tr. 167.) R.T.P. was dismissed from visual therapy after her twelfth session, due to "not a lot of progress" since her initial evaluation. (Tr. 167.)

B.  Counter Force Psycho-Educational Evaluation ("Farkas Evaluation")

On May 17 and May 31, 2011, R.T.P. underwent a psychoeducational evaluation at Counter Force, conducted by Miriam Farkas, M.A., a Certified School Psychologist, and signed off on by Ms. Farkas, Susanna Morgenthau, M.A., and Rosalyn S. Smith, Ph.D., Licensed Clinical Psychologist. (Tr. 143–49.) At the time of the evaluation, R.T.P. was in the second grade at Bais Rochel Satmar and was referred for testing "because of difficulties in all areas of academic functioning," as well as an inability "to focus on her work for long periods of time and . . . to sit in one place." (Tr. 143.)[5]

---

[5] A background portion of the report noted that, according to R.T.P.'s parents, R.T.P.'s "birth and early development" were "unremarkable" and "milestones were met at age appropriate times." (Tr. 143.) R.T.P.'s mother also reported that R.T.P. was generally well-behaved, though

Ms. Farkas observed that R.T.P. demonstrated conversational proficiency in both Yiddish and English, though she spoke with a slight stutter. (Tr. 144.) While Ms. Farkas noted that R.T.P. did not remain in her seat throughout the evaluation and fidgeted in her seat at times, R.T.P. was nonetheless able to pay attention throughout most of the tasks. (Tr. 144.) Ms. Farkas observed that R.T.P. was a friendly and good-natured child who put forth appropriate effort in responding to test questions. (Tr. 144, 148.) She had a difficult time focusing on visually-presented stimuli and tended to put them in her right field of vision. (Tr. 144, 148.)

Ms. Farkas administered, *inter alia*, the following tests: Wechsler Intelligence Scale for Children, Fourth Edition ("WISC-IV");[6] Wechsler Individual Achievement Test, Third Edition ("WIAT-III");[7] Bender-Gestalt;[8] and Conners 3rd Edition, Parent and Teacher Forms ("Conners").[9] (Tr. 144.) Because R.T.P.'s primary language was Yiddish, the testing was conducted in Yiddish, with limited exceptions. (Tr. 143.)

    1.    WISC-IV

The WISC-IV resulted in a Full Scale IQ score of 87, which placed R.T.P. in the Low

_____

more active than other children. (Tr. 143.) R.T.P.'s teachers reported that R.T.P. was of average intelligence, but was struggling to keep up with her class, even though she was in remedial classes for all academic subjects; her teachers noted that R.T.P. knew she was not keeping pace academically, which isolated her from her peers. (Tr. 143.) Additionally, R.T.P.'s teachers reported that R.T.P. had difficulty focusing in class and fidgeted in her seat. (Tr. 143.)

[6] The WISC-IV is a "comprehensive measure of intellectual functioning." (Tr. 145.)

[7] The WIAT-III "measures several academic areas such as Oral Language, Reading, Written Expression, and Mathematics." (Tr. 146.)

[8] The Bender-Gestalt test is used to evaluate visual-motor functioning and visual perceptual skills. (Tr. 147.)

[9] The Conners test is an assessment tool used to obtain observations about behavior from multiple perspectives. (Tr. 147.)

Average range compared to age-group peers. (Tr. 144–45.) However, "[b]ecause of the differences among Composite scores," Ms. Farkas noted that "an analysis of the individual indexes will give a better understanding of [R.T.P.'s] cognitive ability." (Tr. 145.)

R.T.P. scored in the "Average" range in verbal comprehension and working memory. (Tr. 144–45.) She scored in the "Low Average" range in perceptual reasoning, and "Borderline" in processing speed. (Tr. 144.) These composite scores indicate that R.T.P. has a "personal strength" in her "ability to think abstractly," but that she has "difficulty analyzing and synthesizing visual information" and that she "may likely have difficulty [] distinguishing one letter from another." (Tr. 145–46.)

2. <u>WIAT-III</u>

On WIAT-III, R.T.P. scored in the "Borderline" range in Basic Reading, with a variety of subcategory scores that, "particularly when compared to her scores on the WISC-IV, suggest that [she] has a significant reading disability." (Tr. 146.) In Mathematics, R.T.P. scored in the "Low Average" range, indicating, along with various subcategory test scores, that "math is an area of difficulty for her." (Tr. 146.) While a global score in Written Expression was not obtained because R.T.P. was not scored on all tasks in that category, her subcategory scores indicate that her "ability to write letters [is] developing adequately but her ability to use letters to formulate words and sentences [is] below grade level and significantly lower than predicted by her scores on the WISC-IV," suggesting that she "has a writing disability." (Tr. 146–47.) Similarly, while a global score in Oral Language was not obtained, R.T.P.'s performance on various tasks in this category, which were presented to R.T.P. in English, led Ms. Farkas to conclude that R.T.P. is "less proficient in English but is able to understand words in context," that she "has difficulty with word retrieval,

which may account for her slight stutter," and that her "receptive language skills are developing adequately." (Tr. 147.)

### 3. Bender-Gestalt

The Bender-Gestalt test put R.T.P. in the Borderline range on a number of visual-motor functioning tests, suggesting that R.T.P. has difficulty with visual-motor functioning in both the visual and motor components. (Tr. 147.) "Poor visual-motor abilities are predictive of reading and writing difficulties." (Tr. 147.) Ms. Farkas also noted that, with respect to reading Hebrew, there was an "added challenge" in that vowels are usually a series of dots or lines under or near particular letters, requiring "[a] lot more visual decoding" for each letter. (Tr. 147.)

### 4. Conners

The Conners test was completed by R.T.P.'s mother and both of her teachers. (Tr. 147–48.) All three placed R.T.P. in the "Very Elevated range of Inattention," meaning they expressed "many more concerns than typically reported." (Tr. 148.) All three similarly rated R.T.P. as "Very Elevated" in Learning Problems and Executive Functioning, as well as impairment in an academic setting, which "suggest[s] a high probability of a specific learning disability." (Tr. 148.) R.T.P.'s teachers also expressed many more concerns than typically reported in the area of Hyperactivity/Impulsivity, though her mother reported typical levels of concern. (Tr. 148.)

### 5. Summary and Recommendations

Overall, Ms. Farkas concluded that the "discrepancy" between R.T.P.'s Full Scale IQ and various WIAT-III scores "indicate[s] a reading disability" and "a writing disability." (Tr. 148.) Mr. Farkas concluded further that the Conners test results suggested "a high probability of a specific learning disability." (Tr. 148–49.) Therefore, Ms. Farkas recommended, among other things, "a learning program with a focus on remedial reading, such as the Ohr Halimud School,"

"individual special education teacher support services in all academic areas," and "speech and language evaluation" because of her stutter.  (Tr. 149.)

C.    Speech and Language Questionnaire

On March 13, 2012, Rivka Schechter, an Assistant Program Coordinator[10] at OHR Halimud Multi-Sensory Learning Center, completed a Speech and Language Questionnaire with respect to R.T.P.  (Tr. 177–80.)[11]  She noted that R.T.P.'s primary language was Yiddish, but that R.T.P. "can understand English."  (Tr. 177.)  In describing R.T.P.'s developmental age in relation to her chronological age, Ms. Schechter characterized R.T.P. as "somewhat immature," "easily frustrated," and "ha[ving] a hard time focusing and staying on task."  (Tr. 177.)  R.T.P.'s oral motor skills were described as within normal limits, as was R.T.P.'s voice quality and intensity, though Ms. Schechter noted that R.T.P. could often start babbling in a loud voice.  (Tr. 177.)  With respect to the intelligibility of R.T.P.'s speech, Ms. Schechter stated that R.T.P. could be understood 100% of the time by people familiar with her and 90% by unfamiliar listeners, but that sometimes R.T.P. needed to be slowed down.  (Tr. 177.)  R.T.P. was also described as "stutter[ing] when she wants to answer a question or share something with the class," and "rush[ing] through" her speech such that she often needed to be told to slow down.  (Tr. 177.)  Ms. Schechter observed that R.T.P. was able to communicate well with her peers, despite her stutter, though she noted that

_____

[10] While the administrative law judge ("ALJ"), in his opinion, referred to Ms. Schechter as a doctor, there is no indication in the record that Ms. Schecter has a medical degree.  Indeed, the record evidence demonstrates only that she self-identifies as a school administrator, an Assistant Program Coordinator at OHR Halimud.  (*See* Tr. 180.  *See also* Def. Mot. at 17 n.5 ("The decision refers to Ms. Schechter as a doctor whereas Ms. Schechter identifies herself as an Assistant Program Coordinator . . . .").)  Therefore, the Court refers to her in this Order as "Ms. Schechter," rather than "Dr. Schechter."

[11] Ms. Schechter provided an extra copy of this same questionnaire, dated April 17, 2012.  (Tr. 183–87 (including handwritten note reading "this is a copy of questionnaire sent March").  *See also* Def. Mot. at 5 (Tr. 184–87 "repeated" Tr. 177–80).)

R.T.P. had trouble with word retrieval in class, though not in social conversations, and tended to pause after being asked a question before answering, and then stuttering. (Tr. 178.)

Asked to provide R.T.P.'s most recent standardized test scores in a formal language assessment, Ms. Schechter listed four WIAT-III scores:  81 in Early Reading, 55 in Reading Comprehension, 90 in Listening Comprehension, and 69 in Basic Reading. (Tr. 178.)[12]  Ms. Schechter reported that R.T.P.'s language skills were "grossly age-appropriate," though she described the severity of R.T.P.'s overall delays as "moderate," explaining that R.T.P. "displays poor impulse control," "will often wander off topic," and "often does not follow directions." (Tr. 179.)  Ms. Schechter also noted that R.T.P.'s pragmatic skills were not age-appropriate, in that R.T.P.'s voice, tone, volume, and responses were often not appropriate to the situation. (Tr. 179.) Ms. Schechter observed that R.T.P. was aware she required assistance to strengthen her language skills and needed "continual repetition and practice to retain information," noting that R.T.P. was in a 12:1:1 special education classroom and received one-on-one instruction four times per week for 45 minutes per session. (Tr. 179.)  Her "diagnosis" of, or "prognosis" for, R.T.P. was that she was "speech and language impaired." (Tr. 180.)

    D.    <u>Consultative Evaluations</u>

        1.    <u>Dr. D. SanJose-Santos and Other State Consultants</u>

On May 1, 2012, State agency pediatric consultant Dr. D. SanJose-Santos recommended an ophthalmology exam and referred R.T.P. to a psychiatric review physician for evaluation. (Tr. 188–89.)  On May 7, 2012, State agency psychiatric consultant Dr. J. Belsky stated that the case

---

[12] These scores appear identical to those reported in the Farkas Evaluation (*see* Tr. 145), so the Court assumes those results were the most recent test scores at the time Ms. Schechter completed the Speech and Language Questionnaire.

was not a psychiatric allowance.[13]  (Tr. 190.)  On May 30, 2012, Dr. Jeffrey Spitzer, an ophthalmologist, performed a consultative visual acuity evaluation.  (Tr. 192.)  Dr. Spitzer concluded that R.T.P.'s visual acuity was 20/20 in each eye without correction, though he noted that the visual field in R.T.P.'s right eye was not consistent with the examination and could indicate a neurologic abnormality.[14]  (Tr. 192.)  Dr. SanJose-Santos reviewed these results on June 8, 2012, acknowledging that the "abnormal visual field in the right eye is not consistent with eye exam." (Tr. 196–97.)

In a Childhood Disability Evaluation Form, consultants Dr. SanJose-Santos (Pediatrics), M. Lieberman (Speech Language Pathology), and Dr. Belsky (Psychiatry)[15] identified R.T.P.'s impairments as "learning disorder, academic delays, reading disorder, speech and language delays, some attentional problems, and [history of] dyslexia."  (Tr. 203–08.)  Despite finding that this combination of impairments was severe, the consultants concluded that the combination did not meet, medically equal, or functionally equal any disabilities listed in the SSA's regulatory listings, as required for a disability finding.  (Tr. 203.)

Specifically, the consultants found that R.T.P. had less than marked limitations in the

---

[13] While neither the record nor either party provides a definition of a "psychiatric allowance," the Court interprets Dr. Belsky's notation as concluding that R.T.P. did not have a psychiatric diagnosis, at least not one that would permit a finding of disability.  *See, e.g.,* Raphael J. Leo & Paula Del Regno, "Social Security Claims of Psychiatric Disability:  Elements of Case Adjudication and the Role of Primary Care Physicians," 3 Prim. Care Companion J. Clin. Psych. 255–62 (2001), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC181194/ (last visited Mar. 31, 2016) ("[A] psychotic disorder that does not precisely satisfy the criteria for schizophrenia, e.g., schizoaffective disorder, can nonetheless result in an allowance.").

[14] Dr. Spitzer did not specify the inconsistency, nor did he specify what type of neurologic abnormality could be indicated.

[15] Dr. SanJose-Santos, Mr. Lieberman, and Dr. Belsky do not appear to have physically examined R.T.P.  They each signed the Childhood Disability Evaluation Form on June 8, 2012, March 21, 2012, and May 7, 2012, respectively.  (Tr. 204.)

domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and moving about and manipulating objects, while they found that she had no limitations in the domains of caring for herself or health and physical well-being. (Tr. 205–06.) The consultants did note that R.T.P. had mild to moderate language delays, with some difficulty in comprehension and verbal skills, and that she "is academically delayed in all subjects," but cited only her WISC-IV results from the Farkas Evaluation, not any of her WIAT-III results. (*Compare* Tr. 205, *with* Tr. 144. *But see* Tr. 205 (consultants noted that "Psychologist[16] stated that [R.T.P.] has a significant reading disability").) In notations under the health and physical well-being domain, the consultants noted that R.T.P. had "[a]bnormal visual field in the right eye," which was "not consistent with eye exam," but there was no notation of Dr. Spitzer's observation that this inconsistency could indicate a neurologic abnormality. (*Compare* Tr. 206, *with* Tr. 192.)

### 2.   Dr. Christopher Flach ("Flach Evaluation")

On February 5, 2013, Dr. Christopher Flach, Ph.D., performed a consultative psychological evaluation. (Tr. 209–12.) At the time of the evaluation, R.T.P. was nine years old and in a fourth-grade special education class, though her mother, who accompanied her, was unsure whether R.T.P. received any speech or counseling at school. (Tr. 209.) R.T.P. had never had inpatient psychiatric hospitalization or outpatient psychiatric/psychological treatment. (Tr. 209.) Her medical and developmental history was normal, and she met all milestones at appropriate ages. (Tr. 209). Further, she did not have any current medical problems, had no history of medical hospitalizations, and was not taking any medication. (Tr. 209.)

---

[16] The Court presumes the "psychologist" referenced here is Ms. Farkas. (*See* Tr. 146 (R.T.P. likely has a "significant reading disability").)

Dr. Flach's observations of R.P included her normal posture, good hygiene, good eye contact, and adequate speech, though he did not completely rule out expressive and receptive language delays. (Tr. 210.) Dr. Flach noted that R.T.P.'s motor behavior was restless, that her response to instructions required some repetition "due to difficulty with attention," and that her "[a]ttention and concentration fluctuated." (Tr. 210.) Overall, Dr. Flach noted that R.T.P. did not evidence significant emotional distress during the evaluation, and concluded that the results of the evaluation were a "valid and reliable estimate of her [then-]current level of functioning." (Tr. 210.)

Dr. Flach administered the WISC-IV test, with R.T.P. scoring as follows (in comparison to the earlier scores in the Farkas Evaluation):

|  | Farkas Evaluation (Tr. 144) | Flach Evaluation (Tr. 210–11) |
|---|---|---|
| Verbal Comprehension | 99 | 81 |
| Perceptual Reasoning | 82 | 73 |
| Working Memory | 99 | 74 |
| Processing Speed | 78 | 68 |
| **Full Scale IQ** | **87** | **69** |

Dr. Flach concluded that R.T.P.'s IQ score placed her intelligence "in the mild range of mental retardation." (Tr. 211.)

Regarding her living conditions, Dr. Flach noted that R.T.P. needed reminders to get dressed, but she went to the restroom and brushed her teeth by herself, used a fork and knife, cleaned up after herself, and put away her toys. (Tr. 211.) However, from a daily functioning perspective, Dr. Flach concluded that R.T.P. had problems attending to, following, and understanding age-appropriate directions, as well as completing age-appropriate tasks. (Tr. 211.)

He noted further that, while R.T.P. seemed to adequately maintain appropriate social behavior and respond appropriately to changes in the environment, she had some difficulties learning according to levels of cognitive functioning, and asking questions and requesting assistance in an age-appropriate manner. (Tr. 211.) Dr. Flach concluded that "the results of the examination do appear consistent with learning problems which seem as though they would interfere with [R.T.P.'s] ability to function on a daily basis." (Tr. 211.) His recommendation was that R.T.P. continue her educational program, keep up with her medical follow-up, and consider psychological counseling where necessary. (Tr. 211.) Her prognosis "seemed good." (Tr. 211.)

E.     Treating Physician's Functional Equivalence Questionnaire

On March 31, 2013, a doctor from R.T.P.'s pediatrician's office, Rutledge Pediatrics, completed a Functional Equivalence Questionnaire. (Tr. 213–15.)[17] The questionnaire noted marked limitations for R.T.P. in the domains of acquiring and using information, and attending and completing tasks, though they appear to have been denoted "less than marked" limitations initially and then changed to "marked." (Tr. 213.) Commenting on his findings in these domains, the pediatrician noted that R.T.P. had "focusing issues" and increased activity that "interferes with attention." (Tr. 213.) The doctor noted further that R.T.P. has "great difficulty completing tasks," that she "fidgets all the time," and "takes hours to complete simple homework tasks." (Tr. 213.)

The questionnaire noted less than marked limitations for R.T.P. in interacting and relating with others, moving about and manipulating objects, and caring for herself, and noted no limitation in health and physical well-being. (Tr. 213–14.) In comments accompanying the findings on

---

[17] While the ALJ attributed this questionnaire to Dr. Steven Goldstein (*see, e.g.*, Tr. 22), who appears to be one of three physicians affiliated with Rutledge Pediatrics (Tr. 214), the Court notes that the doctor's signature is wholly illegible (Tr. 214) and that, contrary to the ALJ's attribution, it appears more likely that the questionnaire was submitted by Dr. Howard J. Rosman, another Rutledge Pediatrics physician and R.T.P.'s primary care doctor (Tr. 215).

moving about and manipulating objects, however, the doctor noted that R.T.P. gets occupational therapy "due to writing issues," and in comments related to the findings on caring for herself, the doctor noted that R.T.P. "requires adult supervision all the time" and that she is "not capable of caring for herself." (Tr. 214.)

In addition, in a patient summary form submitted with the Functional Equivalence Questionnaire, a list of patient encounters reveals that R.T.P. had previously been diagnosed with "[a]ttention deficit disorder with hyperactivity" on February 13, 2011, with "[s]imple disturbance of attention with overactivity" on August 31, 2011, with "irregular eye mvmnts NEC" on August 27, 2012, and with a "[l]earning defect, specific" on March 20, 2013. (Tr. 215.)

III.  Procedural History

On June 8, 2012, Plaintiff's claim for SSI for R.T.P. was denied. On June 14, 2012, a hearing before an ALJ was requested, and on April 3, 2013, ALJ Lucian A. Vecchio presided over such a hearing, in which he heard testimony from R.T.P., Plaintiff, and Edward N. Halperin, a psychiatrist called by the ALJ as a medical expert. (Tr. 11.)[18] R.T.P. was represented at the hearing by an attorney. (Tr. 11, 40.)

A.  Plaintiff's and Claimant's Testimony at the ALJ Hearing

At the hearing before the ALJ, Plaintiff testified that R.T.P. lived at home with him, his wife, and three other children. (Tr. 41.) When asked by the ALJ why he thought R.T.P. was disabled, Plaintiff responded: "She can't finish tasks. She can't focus, comprehend, distracting in school, multiple complaints[.] [S]he yells at little kids." (Tr. 42.) Plaintiff also attested to R.T.P.'s

---

[18] Finding no evidence to the contrary in the record, the Court has taken this procedural history from the ALJ's opinion.

learning disability, explaining that "she's less than first grade level now with reading and math and writing and spelling and so forth." (Tr. 42.)

The ALJ then examined R.T.P., asking her to recite the alphabet, which she did. (Tr. 42.) When asked to spell her first name, she spelled it incorrectly, though she spelled her last name correctly. (Tr. 42.) The ALJ asked R.T.P. to add three and three together, to which R.T.P. correctly responded six. (Tr. 43.) In response to the ALJ's question of whether there was a subject in school that she liked, R.T.P. stated that she liked reading, and answered affirmatively when asked whether she liked to read stories and whether she found them interesting. (Tr. 43.) She testified that her teacher "like[d]" her and responded "not really" when asked whether anybody picked on her in school. (Tr. 43.)

When the ALJ asked whether there was anyone at her school who was "really, really smart and always gets the answers right," R.T.P. answered, "Not really." (Tr. 44.) She then stated she wanted to be a nurse when she grew up. (Tr. 44.) The ALJ proceeded to ask R.T.P. about her friends, to which she responded that she had a best friend, told the ALJ the friend's name, and answered that her best friend made her laugh. (Tr. 45.) When asked whether school was tough or whether she had a "hard time," R.T.P. answered, "Not really." (Tr. 45.) She also answered that she did all of her homework, and that her mother helped her with it. (Tr. 45.) R.T.P. testified that she slept well and ate well. (Tr. 46.)

B.      Dr. Halperin's Testimony at the ALJ Hearing

After hearing testimony from Plaintiff and R.T.P., the ALJ called on Dr. Halperin to testify as a medical expert.[19] (Tr. 46–47.) Dr. Halperin reviewed R.T.P.'s medical record prior to

---

[19] Dr. Halperin is board certified in adult and child psychiatry. He spent three years as a resident in adult psychiatry at Metropolitan Hospital in Manhattan, another two years as a Fellow in child psychiatry, also at Metropolitan Hospital, and has been practicing in the New York area

testifying, and heard Plaintiff's and R.T.P.'s testimony prior to his taking the stand. (Tr. 47.)

Dr. Halperin initially examined R.T.P. to clarify whether she had a stutter. (Tr. 47.) During that examination, Plaintiff interjected that R.T.P. stuttered when speaking Yiddish, her first language, but did not stutter when she spoke English, because she "has to think" about the translation from Yiddish to English. (Tr. 48.) Plaintiff further testified that R.T.P. received speech therapy. (Tr. 48.) Dr. Halperin clarified with R.T.P. that she is taught both English and Hebrew at school, and that she is "[g]ood" at writing Hebrew. (Tr. 48.) He also asked R.T.P. to read from a book, which she did, though inaudibly at multiple times. (Tr. 48.) After clarifying with Plaintiff that R.T.P. speaks Yiddish at home and clarifying with R.T.P. that she speaks in English to the children at school, Dr. Halperin asked whether English or Yiddish was easier for her to speak, to which R.T.P. responded that Yiddish was easier. (Tr. 49.) R.T.P. also testified that she tries to read Yiddish, but that she could "[n]ot really" read Hebrew. (Tr. 49.) When Dr. Halperin asked whether it was hard trying to learn three languages, R.T.P. responded "[n]ot really." (Tr. 49–50.)

After finishing his questioning of Plaintiff and R.T.P., Dr. Halperin was himself questioned by the ALJ. He testified that, while R.T.P.'s medical record contained a full scale IQ result of 69—in the Flach Evaluation—there was also an earlier IQ test result of 87—in the Farkas Evaluation—that "finds [R.T.P.] within the average range." (Tr. 50.) Dr. Halperin thought this was "really pretty important," concluding that "basically [he] think[s] [R.T.P.] is of normal intelligence." (Tr. 50.) Before going through the regulatory listings with the ALJ, Dr. Halperin testified as follows:

Q   So you think the IQ of 87 is controlling?

---

for the past 35 years. (Tr. 46–47.) R.T.P.'s attorney had no objection to Dr. Halperin being called as a witness, nor did he have any questions as to his competence to speak as a medical expert. (Tr. 47.)

A   I think, yes, it is.  I think the other IQ may be contaminated for reasons that I can't quite say what they are.  I don't know.  [R.T.P.] doesn't have any neurologic condition as far as I can see.  She has friends.  She does read probably at about second or third grade level in English.  She's also given the burden of learning two other languages.  English is her secondary language and I think at a later age some of the deficiencies in English show up more strikingly than in an earlier age where it's much more simplified.

Q.  Anything else?

A.  No.

Q   Anything to indicate dyslexia, sir?

A   I think there probably is some dyslexia.  There's always confusion.  I, myself, suffered from it when I was growing up and going to Ida Cheever and didn't do well learning Hebrew, but I think over the years I managed, at least with English, being reasonably competent, competent in learning other foreign languages.  So I think it's an adventitious[20] type of problem that [R.T.P.'s] having that's really not central to her ongoing functioning.

Q   Anything else you see that we should know about?

A   No.

(Tr. 50–51.)

The ALJ then proceeded to ask whether R.T.P. met or equaled any of the listings set forth in the Social Security Act's ("the Act") implementing regulations, to which Dr. Halperin replied "No."  (Tr. 51.)  With respect to the domains of functionality set forth in the regulations, Dr. Halperin testified, largely without explanation, that R.T.P. had no limitations in interacting and relating with others; no physical issues in health and physical wellbeing, though he recognized that R.T.P. received some speech therapy (thus suggesting a health or well-being issue); and less than marked limitations in acquiring and using information, attending and completing tasks, and moving about and manipulating objects.  The ALJ's finding regarding the last category was based

---

[20] "Adventitious" can mean "coming from another source and not inherent or innate," or "arising or occurring sporadically or in other than the usual location."  *See* Adventitious, Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/adventitious (last visited March 31, 2016).

on R.T.P.'s "stammering" and the fact that she "gets some occupational therapy for some reason or other," which "may be fine motor coordination and writing, penmanship, . . . help in writing." (Tr. 52–53.)

R.T.P.'s counsel then questioned Dr. Halperin and clarified that Dr. Halperin believed the Flach Evaluation's IQ score was skewed because of R.T.P.'s difficulties in negotiating between two or three languages. (Tr. 53.) Dr. Halperin acknowledged that it was "possible" that R.T.P. was in special education classes because "she has difficulty completing tasks and she's unable to understand what goes on in a regular setting of a classroom," and that it was similarly "possible" the Flach Evaluation's full scale IQ score of 69 might be accurate and the Farkas Evaluation's IQ score of 87 might not be accurate. (Tr. 54.) When the ALJ interjected to inquire whether "IQs go up or down," Dr. Halperin testified that R.T.P.'s results "got so high that you wonder why [they would] go down so significantly, it's over 15 points, without some organic or neurological thing." (Tr. 54.) R.T.P.'s counsel suggested to the ALJ that, if Dr. Flach had felt that his results were tainted due to the language barrier, Dr. Flach would have noted that in his report. (Tr. 55–56.)

C.    Filing of This Action

On April 19, 2013, the ALJ issued a decision finding that R.T.P. was not disabled within the meaning of the Act and therefore was not entitled to the benefits for which Plaintiff had applied on her behalf. (Tr. 8–28.) On May 30, 2013, R.T.P. appealed the ALJ's ruling to the SSA's Appeals Council, arguing that the ALJ's decision was not supported by substantial evidence (Tr. 5–6), but the Appeals Council denied this request for review on October 2, 2014 (Tr. 1–4). Plaintiff filed this action on December 5, 2014. (Dkt. 1.) The parties cross-moved for judgment on the pleadings, though Plaintiff failed to file a reply in support of his own motion. (Dkts. 11–14.)

Defendant contends that the ALJ applied the correct legal standards and his decision was supported by substantial evidence, which Plaintiff disputes.  (*Id.*)

*DISCUSSION*

I.    <u>Standard of Review</u>

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. §§ 405(g), 1383(c)(3).  In reviewing a final decision of the Commissioner, the Court's duty is "to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard."  *Pollard v. Halter*, 377 F.3d 183, 188 (2d Cir. 2004) (quotation marks omitted).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cudworth v. Colvin*, 605 F. App'x 77, 77 (2d Cir. 2015) (summary order) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (alterations and quotation marks omitted)); *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 83 (2d Cir. 2015) (summary order); *Pollard*, 377 F.3d at 188.  In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999) (quotation marks omitted).  But "it is up to the agency, and not this court, to weigh the conflicting evidence in the record."  *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).

Where "there are gaps in the administrative record," however, remand to the Commissioner "for further development of the evidence" is appropriate.  *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir.

1996) (quotation marks omitted); *see also Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history . . . ."); *Scott v. Astrue*, No. 09-CV-3999, 2010 U.S. Dist. LEXIS 68913, at *32 (E.D.N.Y. July 9, 2010) ("In light of the ALJ's affirmative duty to develop the administrative record, an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.") (quotation marks omitted); *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly."). Remand is also appropriate where further findings or explanation will clarify the ALJ's reasoning in arriving at the decision on appeal. *See Maragl v. Colvin*, No. 13-CV-2435, 2015 U.S. Dist. LEXIS 99418, at *50–51 (E.D.N.Y. July 29, 2015).

II.     <u>Eligibility Standard for Social Security Disability Benefits</u>

To qualify for disability benefits, a child under the age of 18 must not "engage[] in substantial gainful activity" and must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C); *see also Miller v. Comm'r of Soc. Sec.*, 409 F. App'x 384, 386 (2d Cir. 2010) (summary order).

The SSA has provided a three-step sequential analysis to determine whether a child is eligible for SSI benefits on the basis of disability.    20 C.F.R. §§ 416.924(a).    First, the ALJ determines whether the child is engaged in substantial gainful activity; if so, the child is deemed not disabled, and the inquiry ends. *Id*. §§ 416.924(a), (b).  Second, the ALJ determines whether

the child has a medical impairment or combination of impairments that is "severe"; as at step one, if the child is found not to have such an impairment or combination of impairments, she shall be deemed not disabled and the inquiry terminates. *Id*. §§ 416.924(a), (c). Finally, at the third step, the ALJ must consider whether the impairment "meet[s], medically equal[s], or functionally equal[s]" a disability listed in the SSA's regulatory Listing of Impairments ("Listings"). 20 C.F.R. §§ 416.924(a), (d); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (Listings). The standards for functional equivalence are set forth in 20 C.F.R. § 416.926a, *id*. § 416.924(e), and require that a child have an impairment or combination of impairments that results in "marked" limitations in two, or "extreme" limitations in one, of the following six domains: "(i) [a]cquiring and using information; (ii) [a]ttending and completing tasks; (iii) [i]nteracting and relating with others; (iv) [m]oving about and manipulating objects; (v) [c]aring for [one]self; and, (vi) [h]ealth and physical well-being," *id*. § 416.926a(a), (b).

A "marked" limitation exists where the impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." *Id*. § 416.926a(e)(2)(i). A marked limitation is the equivalent of the level of functioning expected where standardized testing shows scores "that are at least two, but less than three, standard deviations below the mean." *Id*. "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." *Jones v. Astrue*, No. 07-CV-4886, 2010 U.S. Dist. LEXIS 27523, at *16 (E.D.N.Y. Mar. 17, 2010) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C)).

An "extreme" limitation exists when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. §

416.926a(e)(3)(i).  An extreme limitation is found where a child's functioning is equivalent to that expected with standardized test scores "that are at least three standard deviations below the mean." *Id*.

III.    The ALJ's Decision

In a written decision dated April 19, 2013, the ALJ denied Plaintiff's SSI claim.  (Tr. 11–25; *see also* Tr. 26–28 (list of exhibits considered).)  The ALJ found that R.T.P. had not been disabled, within the meaning of the Act or its implementing regulations, from the date of her application on December 30, 2011 through the date of the decision.  (Tr. 12.)

Much of the ALJ's decision was spent setting forth the standards for evaluating the disability of an individual under the age of 18 under the Act and its implementing regulations.  (Tr. 12–20.)  In the five substantive pages setting forth the ALJ's findings, the ALJ went through the three-step analysis set forth in 20 C.F.R. § 416.924(a):  at step one, he determined that R.T.P. was not engaged in substantial gainful activity; at step two, he determined that R.T.P. had severe impairments, namely, dyslexia and a learning order; but at step three, he determined that R.T.P. did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled the listings.  (Tr. 20.)  He then proceeded to summarize the record evidence, consisting of the testimony of Plaintiff, R.T.P., and Dr. Halperin, and the evaluations of Ms. Farkas, Ms. Schechter, Dr. Spitzer, Dr. SanJose-Santos, Dr. Flach, and Dr. Goldstein.  (Tr. 20–22.)

The first two steps of the ALJ's decision are not in dispute on appeal, but Plaintiff argues that, on the third step, the ALJ did not correctly apply the relevant legal standards and that his decision was not supported by substantial evidence.  (Pl. Opp. at 8–14.)  At that third step, in

concluding that R.T.P.'s impairments do not functionally equal the Listings, the ALJ assessed that R.T.P. had less than marked limitations in the following domains:

- Acquiring and Using Information:  the ALJ found that, while R.T.P. had mild-to-moderate language delays and possibly dyslexia, "as pointed out by Dr. Halperin, these delays are probably due to [R.T.P.'s] attempt to learn English, Yiddish, and Hebrew at the same time." (Tr. 23.)  The ALJ relied on the Farkas Evaluation's earlier full scale IQ score of 87 and noted that R.T.P. had "shown significant improvement over a four-month period, further indicating that the lower IQ test [in the Flach Evaluation] is not valid," though he cited no evidence for his conclusion regarding R.T.P.'s improvement over four months.  (Tr. 23.)

- Attending and Completing Tasks:  the ALJ found that, while R.T.P. has "low average intellectual functioning" and there was evidence that she "had problems staying on task[] and maintaining focus," she was able, at the hearing, "to recite the alphabet, and . . . spoke with a clear voice in English without stuttering." (Tr. 23.)  The ALJ concluded that, "[a]s Dr. Halperin opined, the claimant has normal intelligence."  (Tr. 23.)

- Moving About and Manipulating Objects:  the ALJ noted that his conclusion of a less than marked limitation in this domain was "giving [R.T.P.] the benefit of the doubt," because while the Farkas Evaluation found poor visual-motor coordination, R.T.P.'s most recent visual acuity test showed 20/20 uncorrected vision.  (Tr. 23.)

For each conclusion in these three domains, the ALJ noted that "Dr. Halperin is in agreement with this assessment."  (Tr. 23.)  The ALJ further concluded that R.T.P. had no limitation in the remaining three domains—Interacting and Relating with Others, Caring for Herself, and Health and Physical Well-Being—similarly noting "Dr. Halperin['s] . . . agreement with this assessment" as to each.  (Tr. 23.)

In reaching his decision, the ALJ noted that the evidence was inconsistent with the alleged levels of impairment and did not support a finding of disability. (Tr. 23.) For example, the ALJ noted that, while there was evidence of poor vision in the record, R.T.P.'s most recent visual acuity test showed 20/20 uncorrected vision in both eyes. (Tr. 23.) He referenced Ms. Schechter's opinion that R.T.P.'s speech improved with repetition, her oral motor skills and voice quality were within normal limits, and her communication with peers and overall levels of language skills were age-appropriate, and noted that R.T.P. was able to recite the alphabet and speak well in English without stuttering at the hearing. (Tr. 24.) The ALJ noted that, although the Flach Evaluation had resulted in an IQ score of 69, in contrast to R.T.P.'s previous IQ score of 87 from the Farkas Evaluation, "[a]ccording to Dr. Halperin, . . . the latter IQ score of 69 was contaminated and might reflect [R.T.P.'s] attempt to learn three different languages at the same time." (Tr. 24.) With respect to the opinion of R.T.P.'s treating physician, whom the ALJ identified as Dr. Goldstein, the ALJ concluded that, while Dr. Goldstein had found marked limitations in two domains, he "did not have notes to support his opinion, nor did he give an explanation to substantiate, explain, or justify his opinion." (Tr. 24.) While the ALJ noted that R.T.P.'s "expressive and receptive language skills are in the low adequate range," and that Dr. Halperin had acknowledged that R.T.P. "might have dyslexia and some learning limitations," the ALJ nevertheless concluded that, at the hearing, R.T.P. had understood his questions well and responded to them in a deliberate and self-correcting manner, that her attention and concentration were adequate and age-appropriate, and that she did not show any evidence of emotional distress or other limitations, all of which was consistent with Dr. Halperin's finding that R.T.P.'s conditions did not meet or equal any Listing. (Tr. 24.)

The ALJ explicitly identified the weight he accorded to the various professionals' opinions he considered, as follows:

| **Opinion** | **Weight Accorded** | **Reason** |
|---|---|---|
| Ms. Schechter | Significant | • Consistent with the evidence |
| Dr. Halperin | Significant | • Consistent with majority of the evidence (namely, Ms. Schechter's opinion and the Farkas Evaluation)<br>• Experienced and impartial expert<br>• Familiarity with regulations |
| Dr. SanJose-Santos | Some | • Consistent with the evidence (namely, Ms. Schechter's and Dr. Halperin's opinions) |
| Dr. Flach | None | • Not consistent with the evidence (namely, Ms. Schechter's, Dr. SanJose-Santos's, and Dr. Halperin's opinions) |
| Dr. Goldstein (treating physician) | None | • Not consistent with the evidence (namely, Ms. Schechter's, Dr. SanJose-Santos's, and Dr. Halperin's opinions) |

(Tr. 24.)

IV.    Analysis

A.    Failure to Adequately Consider and Develop the Record

While "[i]t is not the place of the district court to weigh the credibility of complex, contradictory evidence," "it is the place of the district court to ensure that the ALJ has faithfully fulfilled his legal duties," one of which is "to adequately develop the record." *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (where clinical findings were "inadequate," ALJ had a "duty to seek additional information . . . *sua sponte*"). This duty is rendered "meaningless if the ALJ did not actually consider the evidence" in the record, meaning that the ALJ cannot "simply pick and choose . . .

only such evidence that supports his determination, without affording consideration to evidence supporting the plaintiff's claims." *Sutherland* at 289; *see also Maragl*, 2015 U.S. Dist. LEXIS 99418, at *47–49 (remanding for failure to adequately consider the record where ALJ "did not adequately explain her reasoning" in denying disability benefits, for example, by citing findings in certain evidence without "address[ing] statements from plaintiff" contrary thereto).

### 1. Dr. Halperin's Testimony

Here, the ALJ based his decision almost entirely on Dr. Halperin's opinion, according it significant weight. (Tr. 23–24.) In evaluating the weight to give medical opinions as to the severity of impairments and how they affect a claimant's ability to function, the ALJ's determination should be based on: (1) whether the source of the opinion has examined the claimant; (2) whether the opinion comes from a treating physician; (3) the extent to which the opinion is supported by relevant evidence; (4) the extent to which an opinion is consistent with the record as a whole; (5) whether the source of the opinion is opining in an area in which he specializes; and (6) other factors that support or contradict the opinion that are brought to the ALJ's attention or of which the ALJ is aware. *See* 20 C.F.R. § 416.927(c). With respect to the third consideration—the extent to which the opinion is supported by relevant evidence—where the opinions come from non-examining sources, "the weight [to be given] their opinions will depend on the degree to which they provide supporting explanations for their opinions." *Id.*

In this case, the ALJ adopted in full Dr. Halperin's opinion, in particular, Dr. Halperin's rejection of the Flach Evaluation, without referencing any of the factors set forth in 20 C.F.R. § 416.927(c) and with only a cursory explanation that, *inter alia*, Dr. Halperin's opinion was "consistent with the majority of the evidence." But the ALJ himself failed to engage in any independent determination of whether the Flach Evaluation was consistent with *other* evidence in

the record, before perfunctorily accepting Dr. Halperin's conclusion.  In fact, it appears that the

Flach Evaluation *was* consistent, not only with Plaintiff's testimony regarding R.T.P.'s disability

(Tr. 42) and the treating physician's report (Tr. 213–14), but also with various aspects of the earlier

Farkas Evaluation.  (*See, e.g.,* Tr. 148 (the "discrepancy" between R.T.P.'s Full Scale IQ score of

87 and various WIAT-III scores "indicate[s] a reading disability" and "a writing disability"); Tr.

148–49 (the Conners test results suggested "a high probability of a specific learning disability").)[21]

The ALJ's failure to address this contrary evidence presents precisely the type of "pick[ing] and

choos[ing]" of evidence that requires remand for further development and consideration of the

record.  *See Sutherland*, 322 F. Supp. 2d at 289; *see also Maragl*, 2015 U.S. Dist. LEXIS 99418,

at *47–49.

### 2.  Treating Physician Rule

The ALJ's failure to develop and consider all of the evidence in the record, including

evidence supporting Plaintiff's claims, is particularly stark in the context of the treating physician's

opinion that the ALJ attributed to Dr. Goldstein.  (Tr. 24.)  Where the ALJ gives less than

---

[21] By raising these issues, the Court does not seek to supplant the credibility determination of the ALJ or to express an opinion as to the ultimate determination of R.T.P.'s disability.  Rather, the Court is identifying these deficiencies in the ALJ's opinion to explain why the Court is unable to evaluate properly whether substantial evidence supports the ALJ's ultimate determination.  This is particularly true here because Dr. Halperin's testimony was so sparse.  The totality of his opinion that the Farkas Evaluation's IQ test results were controlling and that the Flach Evaluation was contaminated consist of his statement that:  "I think the other IQ [Dr. Flach's] may be contaminated for reasons that I can't quite say what they are.  I don't know.  [R.T.P.] doesn't have any neurologic condition as far as I can see. . . . She's also given the burden of learning two other languages." (Tr. 50.)  The ALJ did not attempt to more fully develop Dr. Halperin's opinion, for example, by asking the doctor about, or independently considering, seemingly contrary evidence in the record. (*See, e.g.*, Tr. 145 (Ms. Farkas's conclusion that "an analysis of the individual indexes will give a better understanding of [R.T.P.'s cognitive ability]" than merely her full scale IQ score of 87, "[b]ecause of the differences among Composite scores"); Tr. 192 (Dr. Spitzer's finding of an inconsistent visual field in R.T.P.'s right eye, which Dr. Spitzer found could indicate a neurologic abnormality).)

controlling weight to a claimant's treating physician, the ALJ must provide "sufficient[ly] specific[]" and "good reasons" for making that determination, and the failure to do so is, in itself, a ground for remand. *See Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 427–28 (S.D.N.Y. 2010); *see also* 20 C.F.R. § 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."); *Snell*, 177 F.3d at 133–34 (remanding to Appeals Council for further proceedings where, among other things, Council failed to provide "a statement of the reasons" on which a treating physician's finding of disability was rejected).

Here, the ALJ noted that Dr. Goldstein "did not have notes to support his opinion, nor did he give an explanation to substantiate, explain, or justify his opinion," and the ALJ accorded his opinion no weight as it was "not consistent with the evidence," namely Ms. Schechter's, Dr. SanJose-Santos's, and Dr. Halperin's opinions. (Tr. 24.) The ALJ, however, did not address whether the treating physician's records were consistent with other evidence in the record, such as the Flach Evaluation, the Farkas Evaluation, or Plaintiff's testimony regarding R.T.P.'s impairments. Moreover, the record suggests that there were notable gaps in the treating physician's records, unaddressed by the ALJ, which pertained directly to some of R.T.P.'s alleged impairments, namely notations in the treating physician's file indicating that R.T.P. had previously been diagnosed with "[a]ttention deficit disorder with hyperactivity," "[s]imple disturbance of attention with overactivity," and "irregular eye mvmnts NEC." (Tr. 215.)[22] The ALJ had a duty to develop the record to address these apparent gaps in the evidentiary record, and to explain his

---

[22] This last notation, in particular, strikes the Court as meriting further development of the record, in light of Dr. Spitzer's visual acuity evaluation of R.T.P. (Tr. 192 (noting visual field in R.T.P.'s right eye was not consistent with examination and could indicate a neurologic abnormality).) The ALJ did not mention this aspect of Dr. Spitzer's report in his opinion.

reasoning as to why, despite being consistent with certain evidence in the record, R.T.P.'s treating physician's opinion was accorded no weight. *See Pratts*, 94 F.3d at 39 (remand appropriate "for further development of the evidence" where "there are gaps in the administrative record").[23]

B.    Failure to Adequately Analyze Credibility of Plaintiff's Statements Regarding R.T.P.'s Symptoms

Where a disability claimant is under 18 years old and unable to adequately describe her disability, the ALJ may consider testimony by someone "most familiar" with the claimant, such as a parent. *See* 20 C.F.R. § 416.928(a); *see also Williams on Behalf of Williams v. Bowen* (*Williams*), 859 F.2d 255, 259, 261 (2d Cir. 1988) (an ALJ must consider both objective and subjective factors, including subjective evidence of disability testified to by the claimant and other witnesses, and "must assess subjective evidence in light of objective medical facts and diagnoses"). As a factfinder, an ALJ has discretion to either accept or reject the testimony of a claimant's parent, but a finding that the parent witness "is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams* at 260–61.

Here, while the ALJ summarized Plaintiff's testimony (Tr. 20), there was no analysis of the consistency, or lack thereof, of that testimony with other evidence in the record, nor any assessment of Plaintiff's credibility. Because the ALJ failed to "assess plaintiff's credibility in

---

[23] The authority cited by the Commissioner (Def. Reply at 6) is not to the contrary. *See, e.g., Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) (summary order) (ALJ would have been required to "seek out additional evidence" had there been "'obvious gaps' in the administrative record"); *Cichocki v. Astrue*, 534 F. App's 71, 77 (2d Cir. 2013) (summary order) (no duty to further develop record "because substantial evidence . . . supported [ALJ's] determination"); *Brogan-Dawley v. Astrue*, 484 F. App'x 632, 634 (2d Cir. 2012) (summary order) (ALJ would be "required" to "recontact" doctor to supplement medical records "if the records received were 'inadequate to determine whether [claimant was] disabled'") (alteration omitted). Here, as stated, the Court is unable to determine at this time whether substantial evidence supports the ALJ's determination because of the ALJ's failure to adequately develop and consider the record, including by failing to affirmatively seek out additional evidence to fill gaps in the treating physician's records.

light of all evidence in the record and provide clear, specific reasons for the credibility assigned to plaintiff's statements regarding the intensity, persistence, and limiting effects of claimant's symptoms," the Court remands for further findings and/or a clearer explanation of the ALJ's decision as to Plaintiff's testimony.  *See Maragl*, 2015 U.S. Dist. LEXIS 99418, at *52–54.

*CONCLUSION*

For the foregoing reasons, the Court DENIES Defendant's motion for judgment on the pleadings, and GRANTS IN PART and DENIES IN PART[24] Plaintiff's motion.  Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), the Court reverses the decision of the Commissioner and remands this case for further proceedings consistent with this Order.  The Clerk of Court is respectfully requested to enter judgment accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 31, 2016
       Brooklyn, New York

---

[24] Given its finding that further administrative proceedings are necessary, the Court denies Plaintiff's request for a remand solely to approve and calculate SSI benefits.